1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9              FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11   JASON BILLINGTON,                     Case No.  1:22-cv-01652-NODJ-BAM
12                Plaintiff,
                                           **FINDINGS AND RECOMMENDATIONS**
13        v.                               **REGARDING PLAINTIFF'S MOTION FOR**
                                           **SUMMARY JUDGMENT**
14   MARTIN O'MALLEY, Commissioner of
     Social Security,[1]                    (Docs. 13, 16.)
15
16                Defendant.
17
18
19                         **<u>INTRODUCTION</u>**

20        Plaintiff Jason Billington ("Plaintiff") seeks judicial review of a final decision of the

21   Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance

22   under Title II and Supplemental Security Income under Title XVI of the Social Security Act.  The

23   parties' briefing on the motion was submitted, without oral argument, to Magistrate Judge Barbara A.

24   McAuliffe for findings and recommendations.  (Docs. 13, 16, 17.)

25
26
27   _____
     [1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023.
     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is substituted
28   for Kilolo Kijakazi as Defendant in this suit.

                                           1

Having considered the parties' briefs, along with the entire record in this case, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence in the record and is based upon proper legal standards. Accordingly, this Court will recommend affirming the agency's determination to deny benefits.

## FACTS AND PRIOR PROCEEDINGS

Plaintiff applied for Title II Disability Insurance and Title XVI Supplemental Security Income on May 4, 2020, alleging that he became disabled on December 24, 2017. AR 311-312.[2] Plaintiff's application was denied initially on July 24, 2020, and on reconsideration on December 18, 2020. AR 71-86; 105-130. Plaintiff requested a hearing before an administrative law judge ("ALJ") and ALJ Mary Parnow held a hearing on August 19, 2021. AR 43-70. ALJ Parnow issued an order denying benefits on the basis that Plaintiff was not disabled on November 2, 2021. AR 18-37. Plaintiff sought review of the ALJ's decision, which the Appeals Council denied. AR 5-11. This appeal followed.

**August 19, 2021 Hearing Testimony**

ALJ Mary Parnow held a telephonic hearing on August 19, 2021. AR 43-70. Plaintiff appeared and was represented by his attorney, Amanda Foss. Stacia Schonbrun, an impartial vocational expert, also appeared and testified. AR 64-69. The ALJ began by noting that she would hold the record open for 30 days for medical evidence from Mercy Orthopedic Spine Center and admitted exhibits 1A through 8A, 1B through 24B, 1D through 16D, 1E through 18E, and 1F through 24F. AR 49.

Upon examination by the ALJ, Plaintiff testified that he was 26 years old, had completed some college, and was waiting on receiving AA certificates for sociology and political science. AR 50. Plaintiff further testified that he worked at Dickie's Barbecue from 2016 to 2018, but was on disability from 2018 "until the company got switched over." AR 50-51. Plaintiff noted that this work was part-time, and he worked 30 hours per week. AR 51. In that role, Plaintiff received $10 per hour and worked in the back of the house, where he lifted up to 100-pound boxes of frozen meats, prepared

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

2

meats and other items, chopped salad, brought items to the front of the restaurant, washed dishes, and took out the trash.  *Id.*  Vocational Expert Dr. Schonbrun asked about Plaintiff's potential past work as a home health aide.  *Id.*  Plaintiff testified that he worked at Parkview convalescent home at the beginning of 2021 but was unable to remain due to seizures.  AR 52.  In that role, Plaintiff worked as a "sitter" where he would work one-on-one with patients, watch patients, and help patients with tasks such as retrieving ice or bringing them outside for a smoke break.  *Id.*  The ALJ noted that she would not consider that job as it was post-onset.  *Id.*

Upon examination by Plaintiff's attorney, Plaintiff noted that he was still having seizures and last had a seizure in July 2021, three seizures May 2021, a seizure in March 2021, and two in January 2021.  AR 53.  He testified that in March 2021, he had a seizure, had another seizure in the emergency room, and had a third seizure outside the hospital once he was discharged.  *Id.*  Plaintiff testified that he had seizures every other month, and also had problems with dislocations during the seizures.  *Id.*  Plaintiff stated that in October 2020 he went to the emergency room with a seizure and dislocated his shoulder at some point during that process.  *Id.*  Plaintiff said that the medical staff then needed to get permission from Plaintiff's mother to sedate him so the shoulder could be put back in place.  *Id.*  He also stated that during his May 2021 seizure, he dislocated his left knee, and during the July 2021 seizure, he re-dislocated his knee and soldier.  AR 53-54.

Plaintiff testified that he was on medications to help control the seizures, though his medications had changed "rapidly" over the previous six months or year.  AR 54.  Plaintiff said that his doctors have adjusted medications to attempt to control the seizures and have switched medications if he has still had seizures.  *Id.*  Plaintiff said that he received instructions from his general practitioner to not drive or operate heavy machinery.  *Id.*  Plaintiff also stated that his orthopedic wanted to do surgery on Plaintiff's left knee, but needed to wait until the seizures were under control.  *Id.*  Plaintiff testified that he had been consistent on taking the medication as prescribed.  *Id.*  However, Plaintiff stated that he continued to have breakthrough seizures even with the medication.  *Id.*  Plaintiff further noted that the timing of the seizures appeared to have changed from having them while or shortly after sleeping in 2017 and 2018 to having them in the middle of the day.  *Id.*

Regarding Plaintiff's dislocations, he testified that if he made certain motions with his right shoulder, the shoulder "kind of feels like it wants to slide out again," so he tried to not lift anything heavy with that arm. AR 55. Plaintiff testified that he could probably lift and hold onto an item weighing 15 pounds, but did not believe he could raise it up to his shoulder level. *Id.* Plaintiff said that he might be able to reach overhead with his right arm, but it "depends on how high up." *Id.* Plaintiff testified that the shoulder socket is loose and that his orthopedic doctor wanted to remedy that but was focused on Plaintiff's left knee. *Id.*

Plaintiff testified that he used a specialized brace to walk, and after walking his knee would swell up in certain places and would bruise. AR 55-56. Plaintiff tried to limit his walking and would elevate and ice his knee. AR 56. Plaintiff would elevate his knee approximately 20 minutes two to three times per day. *Id.* Plaintiff further testified that he had surgery for derangement of his right knee in February 2020 and his right knee was doing "a little bit better" following the surgery. *Id.* However, Plaintiff stated that his right knee still prevented him from making sharp turns given issues with the patella and ligaments. *Id.* Plaintiff said that a surgeon had wanted to repair his left knee, but the surgery was much more intensive than expected. AR 56-57. Plaintiff testified that that surgery required cutting scar tissue out of Plaintiff's knee socket, shaving the ligament on the outer part of the knee, and tightening the ligaments on the inner part of the knee. AR 57. Plaintiff testified that he did not walk with a cane but used a specialized brace. *Id.* Plaintiff stated that he used crutches when he had surgeries, but just used the specialized metal brace for everyday movement. AR 57-58. Plaintiff said that if he was sitting in a regular office chair, his knee would start hurting in ten to twenty minutes and cause an uncomfortable stiffness. AR 58. To relieve the discomfort, Plaintiff would need to ice his knee following sitting. *Id.* Plaintiff stated that he typically tried to elevate his knee above his heart level by putting pillows underneath it and putting ice on top of the knee. *Id.*

In examination regarding activities of daily living, Plaintiff testified that he was able to bathe and dress himself on his own and tried to do a little sweeping but that was the limit of his ability to help with cooking, cleaning, or household chores. AR 58-59. Plaintiff testified that he still had a driver's license but did not think he was supposed to drive. AR 59.

4

Plaintiff further testified that he suffered from panic attacks.  *Id.* He stated that his neurologist prescribed 0.5 milligrams of Klonopin to help with anxiety.  *Id.*  Plaintiff said that the Klonopin helped "a little bit" and it had been "a little while" since he had an actual panic attack.  *Id.*  Plaintiff said that he had different mental problems, but once he was taken off Topamax medication, that appeared to resolve the major panic attacks.  *Id.*  Plaintiff stated that when he was on Topamax, his panic attacks would make him feel like he was having a heart attack.  *Id*.

Plaintiff said that his biggest mental problem was short-term memory, especially following seizures as his memory would be "shot for like probably that whole week at least" and he would need to talk to other people to understand what happened during that time.  AR 60.  Plaintiff said the severity of the memory loss depended on the severity of the seizure.  *Id.*  Plaintiff stated that he was unaware how he made it through the previous semester of school because he did not remember much from the previous year.  *Id.*  Plaintiff said that he had side effects for his medication, and was taken off Gabapentin, Xopri, and Dilantin and was put on Depakote.  AR 60-61.  Plaintiff testified that his Depakote dosage was decreased, as he was getting blurred vision and double vision.  AR 61.  When his vision was impaired, he said he would lay down and close his eyes for a while.  *Id.*  Plaintiff said that the side effects were not as severe following the decrease in dosage and he avoided drinking too many fluids in the morning to avoid those side effects.  *Id.*

Plaintiff testified that a typical day involved doing a little physical therapy on his knees, watching television, and playing video games.  AR 61-62.  Plaintiff also testified that he was admitted to the emergency room following a seizure and dislocated his shoulder in October 2020.  AR 62.  Plaintiff testified that he was hospitalized in June 2018 after having three seizures and was told he had kidney failure, liver failure, and diabetes, but after staying in the hospital for a few days was told his levels were fine.  AR 63.

On examination by the ALJ, Plaintiff testified that he was left-handed.  AR 63.  Plaintiff further testified that he went to BC the previous semester after starting college at CSUB in 2013.  *Id.*  Plaintiff testified that he did not attend college in 2018 as he had too many seizures that year, but was attending college in 2020 and 2021.  AR 64.

Following Plaintiff's testimony, the ALJ elicited testimony from vocational expert ("VE") Stacia Schonbrun.  AR 64-69.  The VE testified that she would inform the ALJ if her testimony conflicted with the Dictionary of Occupational Titles.  AR 64-65.  The VE classified Plaintiff's past work as Cook Helper (DOT No. 317.687-010, medium work, SVP 2).  AR 65.

The ALJ then asked the VE hypothetical questions.  For the first hypothetical, the ALJ asked the VE to consider a hypothetical person with the same age, education, and work experience as Plaintiff who: was limited to light work; limited to no more than occasional reaching overhead bilaterally; was limited to no more than occasional pushing and pulling bilaterally; was limited to no more than frequent reaching in all directions with the right upper extremity; had no limitation on the left upper extremity; could climb ramps and stairs frequently; could never climb ladders, ropes, or scaffolds; had unlimited balance and stoop capacity; had occasional kneel, crouch, and crawl capacity; should avoid all exposure to unprotected heights, dangerous moving machinery, and standing water; was precluded from work involving complex and detailed tasks; retains the ability to perform simple, routine work tasks in a low stress work setting such as no assembly lines or similar production pace type work; and would have no more than occasional contact with coworkers and the general public.  AR 65-66.  The VE testified that these limitations would not allow for the past work.  The ALJ then asked if these limitations would allow for other work in the national economy, and if so, for jobs with GEDs of two or less.  AR 66.  The VE testified that work as a parking lot attendant with erosion would be appropriate, though this was the only work the VE found.  AR 66.  The VE noted that the combination of light and no public contact and two or less GEDs limited the work available.  AR 66-67.

The ALJ then clarified that the limitation was "no more than occasional contact with coworkers and the general public, not a complete preclusion."  AR 67.  The VE then testified that work included: Office Clerk with 50% erosion (DOT No. 239.567-010, light, SVP 2, R2, M1, L2, with 3 million jobs nationally); Parking Lot Attendant with 50% erosion (DOT No. 913.473-010, light, SVP 2, R2, M1, L1, with 147,000 jobs nationally).  AR 67.  The VE further noted that there are one or two positions at the sedentary level.  AR 67.  The VE testified that the other job available was Nut

Sorter (DOT No. 521.687-086, sedentary, SVP 2, R1, M1, L1, with 23,000 jobs nationally). AR 67-68.

The ALJ then asked if there are other sedentary jobs that fit the hypothetical, and the VE testified that the other jobs were "R3." AR 68. The VE testified that she could find another job, Bench Hand (DOT No. 700.687-062, sedentary, SVP 2, R2, M1, L1, with 24,000 jobs nationally) that would not be assembly and also fit the limitations. *Id.* However, the VE noted that other titles similar in nature have R3 limitations. *Id.* The ALJ then clarified that, for the record's sake, the ALJ's second hypothetical would be that the individual was reduced to sedentary level work and that the VE identified the Nut Sorter and Bench Hand positions. *Id.*

On examination by Plaintiff's attorney, the VE testified that if the individual in the first hypothetical was likely absent two days per month unscheduled and consistent, there would not be work for that individual. AR 69. The VE testified that this answer included potential days leaving early or arriving late if the individual did so for two or more days. *Id.*

**Medical Record**

The relevant medical record was reviewed by the Court and will be referenced below as necessary to this Court's decision.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff was not disabled under the Social Security Act. AR 18-37. Specifically, the ALJ found that Plaintiff had engaged in substantial gainful activity from January 2021 through March 2021. AR 23. The ALJ then found that there has been a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity and noted that the remaining findings addressed the periods during which Plaintiff did not engage in substantial gainful activity. AR 24. The ALJ identified the following severe impairments: seizure disorder, obesity, bilateral knee internal derangement status-post surgeries, right shoulder dislocation, left shoulder sprain, depressive disorder, anxiety disorder, and panic disorder. *Id.* The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. AR 24-25.

Based on a review of the entire record, the ALJ found that Plaintiff retained the RFC to perform light work with the limitations that Plaintiff was limited to: occasional overhead reaching, bilaterally; occasional pushing and pulling, bilaterally; no more than frequent reaching in all other directions with the right upper extremity; never climbing ladders, ropes, or scaffolds; frequent climbing ramps or stairs; occasional kneeling, crouching, and crawling; avoiding all exposure to unprotected heights, dangerous moving machinery, and standing water; performing simple, routine, repetitive tasks with a low stress work-setting (such as those with no assembly line or similar work); and no more than occasional contact with coworkers and the general public.  AR 25-29.  The ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "medical opinion(s) and prior administrative medical finding(s)."  AR 26; 25-29.

Given this RFC, the ALJ found that Plaintiff was unable to perform any past relevant work. AR 29.  However, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.  AR 30-31.  The ALJ noted that examples of jobs at the light work level consistent with Plaintiff's RFC included: (1) Office Clerk (DOT Code No. 239.567-010, unskilled, light work, SVP 2, with approximately 3,000,000 jobs in the national economy) and (2) Parking Lot Attendant (DOT Code No. 915.473-010, unskilled, light work, SVP 2, with approximately 147,000 jobs in the national economy).  AR 30.  The ALJ also found that the VE's testimony was consistent with the Dictionary of Occupational Titles and noted that the VE indicated that testimony regarding matters unaddressed by the Dictionary of Occupational Titles was based upon the VE's professional experience.  AR 31.  The ALJ therefore concluded that Plaintiff had not been disabled from December 24, 2017, through the date of the decision.  *Id.*

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112,

1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.,* *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

## DISCUSSION[3]

Plaintiff contends that the ALJ's RFC determination was unsupported by substantial evidence as the ALJ did not include limitations on Plaintiff's ability to interact with supervisors despite those limitations being present in the state agency consultants' reports.  (Doc. 13 at 11-14; Doc. 17 at 1-3.)  Plaintiff further contends that the ALJ erred in failing to independently develop the record and that the ALJ relied upon opinions that examined outdated medical evidence.  (Doc. 13 at 14-15; Doc. 17 at 3-

---

[3] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

4.)  Plaintiff also contends that the ALJ failed to offer clear and convincing reasons for discounting Plaintiff's subjective complaints, as Plaintiff testified that he was more limited than the ALJ found. (Doc. 13 at 16-17; Doc. 17 at 4-5.)

### A.  RFC Limitations

Plaintiff contends that the ALJ's RFC determination was unsupported by substantial evidence as the ALJ did not include limitations on Plaintiff's ability to interact with supervisors despite those limitations being present in the State Agency Psychological Consultants' reports.  (Doc. 13 at 11-14; Doc. 17 at 1-3.)  In particular, Plaintiff faults the ALJ for failing to include a limitation with supervisors in the RFC.

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).  "[A]n RFC that fails to take into account a claimant's limitations is defective."  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

"Where an ALJ accords substantial or great weight to a physician's opinion, he must either incorporate their findings into the RFC or offer an explanation for why he chose not to accept them." *Sahyoun v. Saul*, No. 2:18-CV-576-EFB, 2020 WL 1492661, at *3 (E.D. Cal. Mar. 27, 2020), citing *Martin v. Comm'r of Soc. Sec. Admin.*, 472 F. App'x 580 (9th Cir. 2012) (unpublished) ("The administrative law judge (ALJ) erred when formulating Martin's residual functional capacity (RFC) because the RFC neither incorporated Dr. Steiner's opinion of Martin's work limitations nor gave specific and legitimate reasons for rejecting it.") and *Neufeld v. Berryhill*, No. 2:16-cv-03644 (VEB), 2018 WL 4739699, at *6 (C.D. Cal. Sept. 30, 2018) ("Having afforded 'great weight' to the opinions of Dr. Bartell and Dr. Loomis, the ALJ was bound to either incorporate their findings as to Plaintiff's limitations or explain why she decided not to accept them."); see also *Bain v. Astrue*, 319 F. App'x 543, 545-46 (9th Cir. 2009) (holding ALJ erred in not including consultative examining psychologist's moderate limitations in the RFC, despite specifically crediting these limitations in the opinion); *Flores v. Saul*, No. 1:18-cv-01523-SKO, 2020 WL 509098, at *5 (E.D. Cal. Jan. 31, 2020) (finding ALJ erred by assigning great weight to consultative psychologist's opinion, but failing to provide specific and legitimate reasons for rejecting significant portions of the opinion); *Wascovich v. Saul*, No. 2:18-cv-

10

659-EFB, 2019 WL 4572084, at *3-*5 (E.D. Cal. Sept. 20, 2019) (finding ALJ erred by assigning substantial weight to consulting examiner's opinion that the plaintiff had a mild to moderate impairment in her capacity to maintain regular attendance, but failed to account for the limitation in the RFC).

Here, the ALJ's RFC limited Plaintiff to "performing simple, routine, repetitive tasks with low stress work-setting (e.g., no assembly line or similar work) with no more than occasional contact with coworkers and the general public." AR 25. The ALJ also found the opinions of the state agency medical and psychological consultants persuasive. AR 28-29.

In her assessment, consultant Dr. Elizabeth Covey noted that Plaintiff was "Not significantly limited" in the "ability to accept instructions and respond appropriately to criticism from supervisors" but was "Moderately limited" in the ability to interact with the general public and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. AR 83. Dr. Covey further wrote that Plaintiff "appears capable of superficial interaction w supervisors and coworkers, with limited interactions w the public." *Id*. In the MRFC Additional Explanation section, Dr. Covey wrote: "Clmt capable of carrying out simple instructions with limited interactions w the public..." AR 84. Consultant Dr. Louis Perrott similarly noted that while Plaintiff was "Moderately limited" in the "ability to interact appropriately with the general public" and the "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," Plaintiff was "Not significantly limited" in the "ability to accept instructions and respond appropriately to criticism from supervisors." AR 125-26. Dr. Perrott wrote that Plaintiff "appears capable of superficial interaction w supervisors and coworkers, with limited interactions w the public." AR 126. Dr. Perrott further wrote: that Plaintiff "retains the capacity to complete simple, routine work tasks (SRT) in a low stress work setting having minimal social demands with coworkers and limited interaction with the general public." AR 127.

Plaintiff contends that the RFC "determination does not address any limitation on Plaintiff's ability to interact with supervisors, nor does she provide any explanation as to why she failed to include this limitation from an opinion she found persuasive." (Doc. 13 at 12.) However, Plaintiff's characterization of the alleged limitations is different from Plaintiff's as described by the consultants.

1   Plaintiff suggests that the consultants "both opined that Plaintiff was limited to 'superficial interaction

2   [with] supervisors and coworkers, with limited interactions [with] the public.'" (Doc. 13 at 12.)

3   However, the consultants both noted that Plaintiff was "Not significantly limited" in the "ability to

4   accept instructions and respond appropriately to criticism from supervisors." AR 83, 125-26. Dr.

5   Covey wrote that Plaintiff "appears capable of superficial interaction w supervisors," and Dr. Perrott

6   wrote that Plaintiff "appears capable of superficial interaction w supervisors." AR 83, 126. Rather

7   than suggesting a limitation, these opinions indicate Plaintiff's capacity for interacting with and

8   responding to supervisors. The ALJ did not include a limitation as to Plaintiff's interactions with

9   supervisors because the consultants' opinions suggested that Plaintiff was not "significantly limited"

10  in that regard. Accordingly, the ALJ did not err by omitting such a limitation in Plaintiff's RFC.

11              **B.  Duty to Develop the Record and Reliance on Opinions**

12              Plaintiff next argues that the ALJ erred by failing to obtain an opinion from an examining

13  medical provider regarding Plaintiff's physical conditions and relied on "outdated" medical opinions.

14  (Doc. 13 at 14-15; Doc. 17 at 3-4.) Plaintiff contends that by relying on non-examining medical

15  opinions that pre-dated a worsening of Plaintiff's conditions, the RFC was not supported by

16  substantial evidence. (*Id.* at 14.)

17              Despite Plaintiff's contentions of ALJ error, it is Plaintiff's burden to establish disability.

18  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990); 42 U.S.C. § 423(d)(5)(A). ("An individual

19  shall not be considered to be under a disability unless he furnishes such medical and other evidence of

20  the existence thereof as the Commissioner of Social Security may require."); 20 C.F.R. §§ 404.1512(a)

21  ("[Y]ou have to prove to us that you are ... disabled ...."), 416.912(a) (same); *Harrison v. Saul*, No.

22  1:19-cv-01683-BAM, 2021 WL 1173024, at *5 (E.D. Cal. Mar. 29, 2021).

23              Plaintiff acknowledges that there were no other opinions contained within the record beyond

24  the state agency medical consultants' opinions. (Doc. 13 at 15.) Plaintiff failed to submit any medical

25  opinions from a treating or examining physician as to his ability to work or his functional limitations.

26  Because it is Plaintiff's burden to present evidence of disability, the mere absence of an opinion from a

27  treating or examining physician does not give rise to a duty to develop the record; rather, that duty is

28  triggered only where there is an inadequacy or ambiguity. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217

1   (9th Cir. 2005); *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) ("[a]n ALJ's duty to

2   develop the record further is triggered only when there is ambiguous evidence or when the record is

3   inadequate to allow for proper evaluation of the evidence."); *Harrison*, 2021 WL 1173024, at *5-6.

4   (finding absence of report from treating or examining source did not give rise to duty to develop the

5   record where record contained opinions of state agency physicians and plaintiff's complete treatment

6   records); *Alvarez v. Astrue*, No. 1:08-cv-01205-SMS, 2009 WL 2500492, at *10 (E.D. Cal. Aug. 14,

7   2009) (finding absence of report from treating physician did not give rise to a duty to develop the

8   record where record contained opinions of the state agency physicians and plaintiff's complete

9   treatment records).

10          Here, there is no indication that the record was ambiguous or inadequate to allow for proper

11   evaluation.  The record included Plaintiff's testimony and the prior administrative findings of the state

12   agency physicians, both of which were summarized and discussed by the ALJ.  AR 25-29 (ALJ

13   discussing Plaintiff's symptoms in connection with findings); AR 28-29 (ALJ evaluating state agency

14   consultants); 43-70 (ALJ hearing); 82-84 (Dr. Covey evaluation); 123-28 (Dr. Perrott evaluation).

15   And, as counsel confirmed at the hearing, the record was complete at the hearing except for a

16   supplement from Mercy Orthopedic Spine Center.  AR 48-49 (Plaintiff's attorney noting that the

17   record was only missing one source from Mercy Orthopedic Spine Center, ALJ agreeing to hold the

18   record open for 30 days to receive that medical evidence).  Absent any inadequacy or ambiguity in the

19   record, the ALJ had no duty to further develop the record.  See, e.g., *Gonzalez v. Kijakazi*, No. 1:21-

20   cv-01676-SKO, 2023 WL 6164086, at *1 (E.D. Cal. Sept. 21, 2023) (finding ALJ had no duty to

21   develop the record further where counsel conceded at the hearing that record contained plaintiff's

22   complete treatment records and no gaps or inconsistencies were noted); *accord Findley v. Saul*, No.

23   1:18-cv-00341-BAM, 2019 WL 4072364, at *6 (E.D. Cal. Aug. 29, 2019) (finding ALJ not obligated

24   to further develop the record where counsel stated at the hearing that the record was complete).

25          Plaintiff also argues that the ALJ impermissibly offered his lay interpretation of raw medical

26   data in formulating Plaintiff's RFC. (Doc. 13 at 14-15.)  An RFC "is the most [one] can still do despite

27   [his or her] limitations" and it is "based on all the relevant evidence in [one's] case record," rather than

28   a single medical opinion or piece of evidence.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) ("We will

13

assess your residual functional capacity based on all of the relevant medical in your case record.").

Indeed, "[t]he RFC need not mirror a particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence." *Ashlock v. Kijakazi*, No. 1:21-cv-01687-GSA, 2022 WL 2307594, at *3 (E.D. Cal. June 27, 2022); *Gonzalez*, 2023 WL 6164086, at *6; *Mills v. Comm'r of Soc. Sec.*, No. 2:13-CV-0899-KJN, 2014 WL 4195012, at *4 n.8 (E.D. Cal. Aug. 22, 2014) ("[B]ecause it is the ALJ's responsibility to formulate an RFC that is based on the record as a whole, ... the RFC need not exactly match the opinion or findings of any particular medical source.").

Here, the ALJ did not improperly substitute his own opinion for a medical opinion. Rather, the ALJ considered the prior administrative medical findings of the state agency physicians and found them persuasive. AR 28-29. Dr. Eric Christian found that Plaintiff could occasionally lift and/or carry 50 pounds; could frequently lift and/or carry 25 pounds; could stand and/or walk about 6 hours in an 8-hour workday; could sit with normal breaks for about 6 hours in an 8-hour workday; had no limitation in his capacity to push and/or pull except for his lift and/or carry limitations; did not have postural limitations; could only frequently reach overhead with his right upper extremity; had unlimited handling, fingering, and feeling capacity; and did not have visual, communicative, or environmental limitations. AR 81-82. Dr. Covey stated that Plaintiff was "capable of carrying out simple instructions with limited interactions w the public." AR 84. Dr. Perrott stated that, "Although the claimant may have some difficulty sustaining performance of detailed tasks, objectively the evidence shows him to be capable of understanding and recalling simple instructions." AR 127. Dr. Perrott further opined that Plaintiff "retains the capacity to complete simple, routine work tasks (SRT) in a low stress work setting having minimal social demands with coworkers and limited interaction with the general public." AR 127. Dr. Perrott's analysis further shows he considered Plaintiff's history of seizures through the December 2020 date of his opinion. *See* AR 127 ("07/20/20 neuro: report claims clmt has a h/o anxiety and stress induced szs. he has episodes of deja vu once a week but has had not tonic/clonic szs... 08/31/20 neuro: med compliant, has not had a sz. since May... 09/23/20 neuro: claims he had sz. and struck his head on dresser 2wks. earlier. report makes no reference to ER visit...") The ALJ then appears to have adopted the limitations recommended by the state agency

consultants in formulating the RFC.  AR 25.  Plaintiff's argument that the ALJ substituted her own opinion is therefore unavailing.

Plaintiff also complains that the state agency consultants did not consider the full record and thus the ALJ was required to obtain an updated medical opinion. (Doc. 13 at 15.)  Yet, the mere existence of medical records post-dating a state agency physician's review does not in and of itself trigger a duty to further develop the record.  *See, e.g.*, *Charney v. Colvin*, No. CV 1-7080 JC, 2014 WL 1152961, at *7 (C.D. Cal. Mar. 21, 2014), *aff'd*, 647 F. App'x 762 (9th Cir. 2016) (finding that the ALJ did not err in relying on the opinions of state agency physicians that did not account for subsequent medical records where subsequent records were considered by the ALJ and were not inconsistent with RFC); *Smith v. Saul*, No. 1:19-cv-01085-SKO, 2020 WL 6305830, at *8 (E.D. Cal. Oct. 28, 2020) (concluding "updated opinion is not required simply because additional medical evidence is received after the State agency physicians had already reviewed Plaintiff's records.").  Moreover, "there is always some time lapse between a consultant's report and the ALJ hearing and decision, and the Social Security regulations impose no limit on such a gap in time."  *Owen v. Saul*, 808 F. App'x 421, 423 (9th Cir. 2020).  The ALJ is entitled to rely on the state agency consultant's opinions even if subsequent evidence enters the record.  *See, e.g., Keyes v. Comm'r of Soc. Sec.*, No. 1:21-cv-01779-EPG, 2023 WL 2166917, at *2 (E.D. Cal. Feb. 22, 2023).

The ALJ here evaluated the objective medical evidence post-dating the state agency physicians' opinions, including the evidence cited by Plaintiff in his briefing.  AR 26-29 (examining the medical record and evidence regarding Plaintiff's seizure disorder, obesity, shoulder and knee impairments, and psychological symptoms).  The ALJ then interpreted that evidence and formulated Plaintiff's RFC.  *See Smith*, 2020 WL 6305830, at *9 (finding ALJ properly interpreted evidence post-dating state agency physicians' opinions, as charged to do, and formulated RFC).  Furthermore, though Plaintiff argues that the ALJ improperly interpreted the medical evidence regarding Plaintiff's impairments, Plaintiff does not identify what additional functional limitations the ALJ failed to account for in the RFC assessment.  (*See* Doc. 13 at 15.)  Plaintiff's argument that the ALJ erred in not considering the full record or by failing to obtain an updated medical opinion is therefore unavailing.

Accordingly, the Court finds that the ALJ did not err in developing the RFC.

### C.  Plaintiff's Subjective Complaints

Plaintiff next contends that the ALJ committed harmful error by failing to provide clear and convincing reasons for rejecting Plaintiff's testimony as inconsistent with the evidence.  (Doc. 13 at 16-17; Doc. 17 at 4-5.)  In deciding whether to admit a claimant's subjective complaints, the ALJ must engage in a two-step analysis.  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004).  First, the claimant must produce objective medical evidence of her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  *Id.* at 1015.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  AR 26.  However, the ALJ discounted Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms, noting that the statements were not consistent with medical evidence and other evidence in the record.  *Id.*  The ALJ was therefore required to provide specific, clear and convincing reasons for discounting Plaintiff's subjective complaints.

First, the ALJ found that Plaintiff's subjective symptoms were inconsistent with treatment notes.  *Id.*  Although lack of supporting medical evidence cannot form the sole basis for discounting testimony, it is a factor that the ALJ can consider. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).  Regarding Plaintiff's seizure disorder, the ALJ summarized the medical evidence reflecting Plaintiff's history of seizure-like activity, observed seizures, and reported seizures.  AR 26-27.  The ALJ then noted that for the reported May 2021 seizure, Plaintiff was able to follow commands "briskly" when asked to put his mask back on and an in-office EEG was normal.  AR 27; 927 (May 2021 report noting "Patient was previously under the care of another neurologist. Indicates that be had a long term EEG with them which was found to have been abnormal. In office, he had an EEG done which was normal, read by Dr. Virdi."); 958 (May 2021 report noting Plaintiff "began having abnormal behavior including strong jerking movements, while remaining standing upright, then subsequently guided by RN to the ground, alert eyes open and moving all extremities, seems slow to

answer, confused, however follows commands briskly when I asked him to put his mask back on."). The ALJ further noted that medical records did not support Plaintiff's allegations of debilitating seizure frequency based upon medical evidence including: Plaintiff's lack of reported seizures in 2019, generally controlled seizures in April 2020, and treating neurologists' 2021 notes that Plaintiff may suffer from pseudo-seizures or panic attacks.  AR 27; 935 (July 2021 progress note stating Plaintiff "recalls he had no seizures in 2019 with Depakote and Lamictal and would like to go back on this medication regiment back [sic] as he did not respond well with Xcopri."); 563/834 (April 2020 progress note stating "Patient has hx of epilepsy and is controlled at this time."); 947 (October 2020 progress note stating "Patient states that he thinks that his seizures are mostly due to anxiety as he notices that he was doing well throughout 2019 but he has had more frequent episodes for the past 6 months… Patient has been on [Lamictal and Gabapentin] for a while and he was doing well for about 3 months and started to have these syncopal/seizure episodes."); 944 (November 2020 progress note stating Plaintiff "was started on Dilantin and has not had any breakthrough seizures for about a month"); 939 (February 2021 report noting Plaintiff "was having breakthrough seizures in January but has been stable."); 932 (April 2021 progress note stating Plaintiff "is doing better on his current AED meds" and "Denies any recent falls or syncopal episodes"); 927-28 (May 2021 progress note stating that Plaintiff denied "any generalized tonic-clonic seizure activities at this time but continues to have these 'panic attacks' versus seizures versus pseudoseizures… Long-term EEG may be helpful in his case as he often gets these seizure like activities but he stays conscious and alert."); 952 ("Patient had a seizure today, he states he did not take his seizure medicine today because he was feeling nauseous.").

Regarding Plaintiff's knee impairments, the ALJ first noted that Plaintiff's right knee had returned to normal function following reconstruction treatment, though the left knee experienced recurrent dislocation of the left patella.  AR 27; 947-48 (October 2020 report noting history of dislocations); 955-57 (May 2021 report noting "Normal ROM, Left infrapatellar tenderness… No evidence of acute fracture or dislocation. Joint spaces appear normal for age. Chronic ossicle or enthesophyte adjacent to the superior patella… Mild soft tissue swelling without evidence of acute fracture of the knee. Chronic ossific body adjacent to the superior pole the patella."); 669 (June 2019

arthroscopy of the left knee, arthroscopic chondroplasty of the left patella, and mini lateral release of the left knee); 847-48 (June 2020 report noting Plaintiff was doing "well with the right knee… Has full range of motion of the right knee… [and] Denies any significant pain" following right knee MPFL reconstruction in February 2020 but noting remaining issues with left knee and recurrent dislocation of left knee patella).  The ALJ further noted that Plaintiff was then treated for left knee pain in May 2021 following a seizure, but an exam from that time showed normal results except for patellar tenderness of the left knee.  AR 952-955 ("Normal ROM, Left infrapatellar tenderness.").  The ALJ further noted that, following knee surgeries and despite a history of dislocations and following knee surgeries, Plaintiff's neurologists observed normal motor, extremity, and neurological findings.  AR 27-28; 1390 (July 2021 report noting left knee injury, AC joint dislocation, ACL sprain); 954-57 (May 2021 report noting "Normal ROM, Left infrapatellar tenderness… No evidence of acute fracture or dislocation. Joint spaces appear normal for age. Chronic ossicle or enthesophyte adjacent to the superior patella… Mild soft tissue swelling without evidence of acute fracture of the knee. Chronic ossific body adjacent to the superior pole the patella."); 927-28 (May 2021 report noting normal neurological findings, "Moves all extremities," and "Gait is steady"); 930 (July 2021 report noting "Strength is 5/5 in all the muscle groups… Gait is normal"); 932 (April 2021 report noting "Strength is 5/5 in all the muscle groups… Gait is normal"); 936 (March 2021 report noting "Strength is 5/5 in all the muscle groups… Gait is normal"); 948 (October 2020 report noting "Strength is 5/5 in all the muscle groups… Gait is normal").

Regarding Plaintiff's shoulder impairments, the ALJ noted a July 2020 report included an MRI that ruled out abnormalities, a physician's assessment of left shoulder pain and a left shoulder sprain, and a prescription of physical therapy.  AR 27; 849-852 (July 2020 report noting Plaintiff's "left shoulder feels significantly better," finding left shoulder MRI "does not demonstrate a rotator cuff tear… Biceps tendon is intact in the groove. No significant intra articular injury…" and stating that "His shoulder has improved remarkably" and the examining physician "expect[s] him to continue to improve.").  The ALJ further noted that Plaintiff was treated for a dislocated shoulder and suspected Hill-Sachs fracture with a reduction and sling.  AR 27; 901 (October 2020 report noting "Suspected

Hill-Sachs fracture"); 948 (October 2020 report noting Plaintiff's "right arm is in a sling and there is pain with movement on his right shoulder")

Regarding Plaintiff's psychological symptoms, the ALJ noted that Plaintiff had a history of depressive disorder, anxiety disorder, and panic disorder.  *See* AR 28; 1462-63 (April 2021 report noting generalized anxiety disorder and "Moderately severe" depression score but normal psychiatric findings); 751 (noting Plaintiff's history of panic attacks and anxiety); 759 (Plaintiff noted that the seizure in which his shoulder was broken was a traumatic event).  The ALJ further noted that, in April and May 2021, Plaintiff reported that his panic attacks had improved but noted that his Paxil prescription might be causing suicidal ideation, which improved after he tapered the medication.  AR 927-932.  The ALJ also cited an April 2021 report noted history of childhood trauma, social anxiety, unresolved grief/loss as well as slowed speech, constricted affect, "calm but slowed" motor activity, and "Depressive cognitions, ruminations and suicidal ideations."  AR 1454.  However, the ALJ noted that examinations from 2020 and 2021 routinely showed Plaintiff maintained an appropriate mood and affect, cooperative behavior, intact judgment, intact recent and remote memory, and intact alertness. AR 28; 928 (May 2021 report noting "Neuro: patient is awake, alert, and oriented x3. No aphasia, dysarthria, no anomia."); 931 (April 8, 2021 report noting "It has been a month since he had any panic attacks or seizures or pseudoseizures. From his last visit, patient was instructed to taper off Tegretol as this might have been causing his anxiety" but noting normal general, neurological, and psychiatric findings); 934-936 (March 2021 report noting "Patient had to come in for sooner appointment as be has been having frequent panic attacks," instructing Plaintiff to taper off Tegretol to "make sure that the panic attacks and worsening anxiety is not brought on or exacerbated by possible s/e of antiseziure meds," and including normal general, neurological, and psychiatric findings); 938-39 (February 2021 report noting Plaintiff had been doing well but had panic attacks due to increased stress, was "provided a number for therapy/psych referral as he was having more panic attacks d/t high levels of stress," and including normal general, neurological, and psychiatric findings."); AR 941 (December 2020 report noting that Plaintiff states that he "continues to have high level of stress" and "also has anxiety, depression and experiences panic attacks" but general, neurological, and psychiatric findings

were normal); 944-45 (November 2020 report noting Patient also has started to see a therapist" and normal general, neurological, and psychiatric findings).

Regarding Plaintiff's obesity, Plaintiff noted that the obesity impairment was "reasonably calculated to exacerbate symptoms derivative of the claimant's severe impairments" and that "this level of obesity is reasonably calculated to cause balance-related hazards that appropriately limit the claimant with respect to postural activities and tolerating exposure to certain environments." AR 28. The ALJ accordingly included postural and environmental limitations in Plaintiff's RFC. *See* AR 25 ("never climbing ladders, ropes, or scaffolds; frequent climbing ramps or stairs; occasional kneeling, crouching, and crawling; avoiding all exposure to unprotected heights, dangerous moving machinery, and standing water…")

In short, the ALJ examined the record regarding Plaintiff's impairments, and appropriately evaluated Plaintiff's symptoms in light of the objective supporting evidence. Accordingly, the ALJ appropriately discounted Plaintiff's subjective symptoms testimony based upon the lack of supporting medical evidence.

Second, the ALJ considered that, prior to Plaintiff's impairments were well-controlled with treatment and medication. AR 26-28. "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006) (quoting *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983)). The ALJ noted that Plaintiff's seizures were conservatively managed with Xeopri, Dilantin, Lamictal, Depakote, and/or Gabapentin prescriptions. AR  27; 927 (May 2021 report noting Plaintiff's seizure medication history and that he "has been started on xeopri and he has been taking 50 mg daily.  He is tolerating the medication and we are slowly tapering him off some meds that can potentially cause these 'panic attacks' as a secondary s/e.  So far, patient denies any tonic clonic seizures and reported one episode of seizure-like activity a few weeks ago."); 928 (May 2021 report noting "Currently, on Xeopri as well and we have been increasing his dose. Denies any generalized tonic-clonic seizure activites at this time but continues to have these "panic attacks" versus seizures versus pseudoseizures."); 930 (July 2021 report noting Plaintiff "has been having seizures. He will

continue with Dilantin and Lamictal at current dose and restart patient on Depakote 500 mg twice a day since patient was seizure free with Depakote."); 932 (April 8, 2021 report noting Plaintiff "is doing better on his current AED meds. Denies any recent falls or syncopal episodes. His panic attacks have improved" and continuing Lamictal, Gabapentin, Xeopri, and Dilantin prescriptions); 948-949 (October 2020 report noting Plaintiff "has been on Lamictal and we increased his gabapentin from his last visit and he has been tolerating the medication. Unfortunately, patient states that due to his high stressors at home, he continues to have these breakthrough episodes. At this time, patient will be started on Dilantin too mg 3 times a day.").  Accordingly, the ALJ appropriately examined Plaintiff's treatments and medication in assessing Plaintiff's symptoms testimony.

Third, the ALJ found that Plaintiff's subjective symptoms and difficulties were inconsistent with his relatively intact daily activities.  AR 29.  An ALJ may properly discount a claimant's subjective complaints when the daily activities demonstrate an inconsistency between what the claimant can do and the degree that disability is alleged.  *Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012) (an ALJ may consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms"), superseded by regulation on other grounds (identifying two-step analysis in assessing the credibility of a claimant's testimony regarding the subjective pain or intensity of symptoms).  Even where a plaintiff's activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.  *Id*. at 1113.

In assessing Plaintiff's daily activities, the ALJ noted:

> Notably, the claimant reported in December 2020 that he was attending
> college classes, which he began in August 2020 to study sociology
> (Exhibit 6F, 27; 20F, 43). In 2020, he left a therapy session early to
> assist his girlfriend during an emergency (Exhibit 20F, 70). He also
> reporting playing video games and talking to people online (Exhibit 6F,
> 3, 26). He reported being able to attend to his activities of daily living
> and as noted above, he was working in the first quarter of 2021 (Exhibit
> 6F, 12).

AR 28; 771 (August 2020 report with Plaintiff noting that he "started back this semester and studying Sociology"); 1070 (December 2020 report noting Plaintiff attending college under a grant); 1097

(August 2020 report noting "Patient had to leave early due to emergency with girlfriend"); 747 (Plaintiff reporting "I play video games and I'm able to talk to people online, but when there's no one to talk to online it doesn't help"); 770 (Plaintiff reporting "I feel like I only want to play video games and lay in bed all day… I isolate from people on video games too because I won't even want to talk to them"); 756 ("The client is capable of caring for his ADLs and denied any neglect of these or his chores and responsibilities.  He reported he is able to participate in community errands.").  Though Plaintiff contends that the ALJ "does not engage in any discussion of Plaintiff's activities of daily living beyond summarizing Plaintiff's subjective complaints, much less notice any inconsistency between such activities and his reports," as discussed above, the ALJ assessed Plaintiff's daily activities that conflict with the degree of disability Plaintiff alleged.  (Doc. 17 at 4.)  The Court therefore finds the ALJ appropriately assessed Plaintiff's demonstrated daily activities in discounting Plaintiff's subjective complaints.

The Court therefore concludes that the ALJ did not err in discounting Plaintiff's subjective complaints.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, IT IS HEREBY RECOMMENDED as follows:

1.      Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be denied; and

2.      The Clerk of this Court be directed to enter judgment in favor of Defendant Martin O'Malley, Commissioner of Social Security, and against Plaintiff Jason Billington.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, as required by 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that the failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 6, 2024**                      /s/ *Barbara A. McAuliffe*
                                                UNITED STATES MAGISTRATE JUDGE

23